UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-20998-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MAURICE ALEXIS,

    Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS CAUSE comes before the Court on Defendant Maurice Alexis's Motion to Suppress ("Motion"), filed February 12, 2016. (DE 13). Through his Motion, Alexis seeks to suppress physical evidence and statements obtained pursuant to the stop and subsequent search of an automobile that he was driving. The Government responded on February 25, 2016 (DE 17), and the Court held a hearing on February 29, 2016. For the following reasons, the Motion is denied.

**I.**     **Facts**

Detectives Soler and Cerra (the "Detectives") testified that on August 27, 2015, at approximately 12:15 p.m., they were on patrol in the Liberty City area of Miami. The Detectives were members of the Robbery Intervention Detail ("RID") Unit, and were patrolling a demarcated "box" area of streets, looking to prevent robberies and shootings. The Detectives were driving an unmarked police vehicle. As the Detectives drove by a tire store, they observed a group of three or four men standing around a silver Chevy Impala (the "Impala") in the parking lot. The driver's side door to the Impala was open. The Detectives noticed that the Impala had dark black tints on the side windows that appeared to violate Florida law by being too opaque.

The Impala also had visible tinting on the windshield that appeared to encroach below the windshield AS/1 line in violation of Florida law. The Detectives radioed their Sergeant[1] (the "Sergeant") (collectively with the Detectives, the "Officers"), who was also in the area, about what they had seen. The Detectives circled the block, returning to where they had first seen the Impala. In the intervening time, the Impala had exited the parking lot and was following a white SUV ("SUV"). As the SUV and Impala pulled up to a stop sign, the Detectives executed a stop by turning on their lights and driving in front of the SUV. The Sergeant immediately pulled up behind the Impala and activated his lights.[2]

Some of the Officers[3] approached the SUV with guns drawn and told the driver (later identified as Eric Pinkney) to exit the SUV. Pinkney testified that the Officers placed Pinkney in handcuffs and conducted a search of the SUV. The Officers confirmed that Pinkney had a valid driver's license. The Officers released Pinkney and directed him to leave the area. The encounter between the Officers and Pinkney lasted less than a minute.

It is unclear where the driver of the Impala (later identified to be Defendant Maurice Alexis) remained during this time. Pinkney testified that, while Pinkney was in handcuffs, Alexis was standing outside the Impala drinking a fruit punch. However, Pinkney also testified that the Officers made Alexis get back in the Impala and that they later pulled Alexis out of the Impala.

At some point—either at the same time the Officers placed Pinkney in handcuffs and were searching the SUV or shortly thereafter—the Detectives approached the Impala. Detective Soler ordered Alexis to lower the windows of the Impala. After approximately 15-30 seconds, Alexis lowered the windows. Detective Soler ordered Alexis to exit the Impala, and Alexis

---

[1] The Sergeant was not identified by name.
[2] In addition, testimony established that there was at least one more police vehicle on the scene in addition to the two vehicles driven by the Detectives and the Sergeant.
[3] It is unclear which Officers approached the SUV.

2

complied. Detective Soler asked Alexis for his driver's license. Alexis gave Detective Soler his driver's license and said it was "not good."

At some point during Detective Soler's conversation with Alexis, the Sergeant—still parked behind the Impala—ran the Impala's license plate number and discovered the Impala was owned by Hertz Rent-A-Car ("Hertz").[4] The system did not indicate who had rented the Impala or who was authorized under the rental agreement to drive the Impala. Also around this time, though it is unclear exactly when, Detective Soler ran Alexis's driver's license and confirmed it had been suspended.[5] Detective Soler then arrested Alexis for driving with a suspended license.

Detective Soler testified that the Impala was stopped at the intersection and was blocking one lane of a two-lane road. She also said that a crowd had formed around the scene, and the Officers could not release the Impala to anyone at the scene. Detective Soler asked Alexis whether he was the renter of the Impala, or if he knew the renter. Alexis gave her "a name."[6] Detective Soler noted that the named individual was not on the scene. While Detective Cerra testified that the police generally give arrested drivers an opportunity to call someone to pick up their vehicle, in this instance, none of the Officers called the name that Alexis provided or permitted Alexis to call that individual. Detective Soler testified that she decided to tow the

---

[4] While there was some dispute at the hearing as to whether the car was owned by Budget Car Rental, Dollar Thrifty Motor Group, or Hertz, the Parties agreed that the car was owned by Hertz and that the confusion resulted from Hertz's ownership of other rental companies.

[5] Although Alexis presented testimony that the Sergeant did not conduct a search in the state-wide system, Officer Soler credibly testified that the Sergeant may have used the Miami-Dade police's internal system.

[6] The testimony differed as to what Alexis told the Detectives. Officer Soler testified that Alexis "might have said a name of whoever was on the rental agreement" and later testified that "he might have said a name, but it was no one that was on scene." Officer Cerra testified "I don't remember if he couldn't tell us or he wouldn't tell us who it was, who it was on the rental agreement, I believe he couldn't tell us who it was."

3

Impala.[7]  She also testified that her Sergeant was "on scene."  She then conducted what she described as an "inventory search."

While conducting the search of the vehicle, Detective Soler saw that the driver's-side panel of the center console appeared to have been "pulled" open.  After a closer look, Detective Soler saw a firearm and magazine in the area where the panel had been opened.  The firearm and magazine were visible to Detective Soler without her opening the panel.  After the search was completed, Detective Cerra filled out a Vehicle Storage Receipt.  Detective Cerra listed the property in the vehicle as "misc. papers and clothes."

After the search, but before the tow truck arrived, two women approached the Officers.  The younger of the two women asked if she could retrieve some items from the Impala.  The Officers permitted the two women to take some of Alexis's clothing and cologne from the Impala.

Although it is unclear when she arrived at the scene, Tarkescha Andrews ("Andrews") testified regarding her version of what happened on August 27, 2015.  She said she knew Alexis for four months by the time the instant arrest occurred.  During her testimony, she referred to Alexis as her daughter's boyfriend, as well as her son-in-law.  She said that she was renting the Impala while her main car, a Pontiac, was getting repaired.  Andrews testified that she did not list Alexis as an authorized driver under the rental agreement, but that he regularly borrowed the Impala and that she directed Alexis to put tints on the vehicle, at her expense.[8]  She disclaimed any knowledge of the presence of the firearm in the vehicle.  On August 27, 2015, Alexis had

---

[7] Neither Detective Soler nor Cerra had read the Miami-Dade Police Department's (the "Department") Standard Operating Procedures for Towing Vehicles (the "Procedures") until the Government provided the Procedures for their review before the hearing.  They have, however, received training on the Department's tow policies.

[8] Andrews testified that she planned to remove the tints before returning the Impala to Hertz.

4

borrowed the Impala to help a friend with a flat tire.[9] Andrews was working on August 27 when her daughter—also an employee of the same business—told Andrews that she had received a call that the police had arrested Alexis and that Andrews needed to pick up the Impala. Alexis's sister picked Andrews up from work and drove her to the scene, which was 10-15 minutes away.

When Andrews arrived at the scene, she encountered a female officer (likely Detective Soler). Andrews told the officer that she was the renter of the Impala. The officer responded that the Impala was being towed. Andrews waited at the scene until the Impala was towed at 1:58 p.m.

## II. Legal Standard

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. "'[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). A warrantless search or seizure is considered per se unreasonable unless the government meets its burden of demonstrating that an exception applies. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1313 (11th Cir. 2004).

## III. Discussion

At the hearing, Alexis conceded that the Officers lawfully stopped the Impala pursuant to reasonable suspicion that Alexis had violated Florida's window tinting statutes. Therefore, the only two issues before the Court are: (1) whether the evidence obtained from the warrantless search is admissible and (2) whether Alexis can challenge the search of the Impala. As to the first issue, I find the Officers did not conduct a valid inventory search but that the evidence is

---

[9] At the hearing, the Government questioned Andrews about her ability to pay for the rental of the Impala, Andrews testified the rental car cost $250 every two weeks and that her bi-weekly salary was $450. The Government also questioned her about tinting the Impala's windows, which she admitted cost her $245.

5

otherwise admissible under the doctrine of inevitable discovery. As to the second issue, even if the evidence were inadmissible, I find that Alexis cannot challenge the search.

### A. Inventory Search

The first question is whether the evidence is admissible pursuant to the inventory search exception. "[I]nventory searches of legally impounded vehicles, conducted pursuant to an established procedure but without a warrant, are reasonable under the Fourth Amendment." *United States v. Handy*, 592 F. App'x 893, 906 (11th Cir. 2015) (citing *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976)). Inventory searches may meet legitimate government interests such as "(1) the protection of the owner's property while it remains in police custody; (2) the protection the police against claims or disputes over lost or stolen property; and (3) the protection of the police from potential danger." *Id.* (citing *Opperman*, 428 U.S. at 369). However, an inventory search "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).

"A police officer may impound and inventory a vehicle when he has acted pursuant to standard criteria or police procedures." *United States v. Akinlade*, 519 F. App'x 529, 535 (11th Cir. 2013) (citing *Colorado v. Bertine*, 479 U.S. 367, 375-76 (1987)). The "decision to impound a car may involve discretion but must be made . . . on the basis of something other than suspicion of evidence of criminal activity." *Handy*, 592 F. App'x at 906. The burden is on the Government to show that the "requirements of the inventory search exception have been met." *Id.*

The Government contends that the Officers conducted an inventory search in order to protect the property itself, the public, and to shield the Department from liability. (DE 17). I disagree. In this case, based on circumstances surrounding the search of the vehicle, I find the search of the Impala cannot be properly characterized as an inventory search. Specifically, the

6

Officers' actions immediately before the search of the Impala, the timing of the search, and the Officers' actions in permitting items to be freely removed from the Impala suggest the search was aimed at finding suspected evidence of criminal activity.

The actions leading up to the search of the Impala, including an illegal search of the SUV, indicate the search of the Impala was for the purpose of discovering criminal activity. On August 27, 2015, the Officers were patrolling a specific grid of streets. The Officers' mission was to prevent robberies and shootings.[10] The Detectives zeroed in on the Impala as a target and decided to circle the block to follow the car. The Officers executed a stop and quickly began to search two cars: the SUV and the Impala. There were three police vehicles and at least four police Officers on the scene—the amount of resources involved suggests that suspicion that the Impala violated the window-tint statutes was not the only purpose for the stop. The Officers placed Pinkney, the driver of the SUV, in handcuffs and conducted a warrantless search of the SUV, which—in addition to the fact that the SUV was not stopped based on reasonable suspicion—was an illegal search. The search of the SUV without arrest of the driver or any necessity for an inventory search belies the inventory search rationale.

The timing of the search of the Impala, following the illegal search of the SUV, suggests that the search was conducted to discover evidence of criminal activity, not to inventory the contents of the vehicle after deciding to tow. The Government suggests the events occurred as follows: the Detectives asked Alexis to step out of the vehicle and they checked his license; the Detectives arrested Alexis; the Detectives found it reasonable under the circumstances to tow the Impala; and then the Detectives searched the Impala. However, based on the testimony, I find it

---

[10] While the Officers' reason for initiating the stop does not generally render an inventory search impermissible, because I find that the Officers' later actions indicate the search for evidence continued to be the motivating factor to initiate the search, this background is helpful.

7

more likely that the Detectives searched the Impala either contemporaneously with, or immediately after, the arrest.[11]

Crucially, the Officers' actions after the search are inconsistent with two of the legitimate purposes of an inventory search. Detective Cerra did not inventory the items found with any specificity—he wrote generally that there were "misc. papers and clothes." In addition, the Officers freely permitted two unknown women to take items, including clothes and cologne, from the vehicle after the search of the Impala was supposedly conducted. In the Vehicle Storage Receipt, Officer Cerra makes no mention of cologne or of releasing certain items. These omissions indicate either (1) the Officers did not properly inventory the items in the vehicle and then released items without noting them on the receipt; or (2) the inventory of items actually occurred after an initial search of the Impala. Under either explanation, the actions are inconsistent with the legitimate purpose of taking an inventory to protect the owner's property or to shield the police department from liability.

Beyond the circumstances surrounding the search, the failure to follow standard procedures is further evidence that the search cannot properly be characterized as an inventory search. Despite the fact that the policies mandate the Officers should have attempted to locate the owner or a driver for the Impala,[12] and that Miami-Dade officers generally give arrestees an opportunity to find a driver of the vehicle, no attempt seems to have been made to contact Hertz or to determine the authorized driver. *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) (although arresting officers are "not constitutionally required to permit [the arrestee] to make an

---

[11] Although Alexis appears to have been standing handcuffed near the Impala and potentially within reaching distance of the front passenger compartment, the Government did not argue that the Officers searched the Impala incident to Alexis's arrest based on *Arizona v. Gant*, 556 U.S. 332 (2009).

[12] Department's Procedures provide that officers "shall make a reasonable effort to locate the owner/driver . . . . If canvasses of the immediate area or other attempts to locate the owner/driver are unsuccessful, the vehicle shall be towed[.]" (Government's Exhibit 6, Miami-Dade Police Policies, Chapter 19-01 at § 6.I.H.2).

8

alternative disposition of his vehicle . . . case law requires that the decision to impound [an arrestee's] vehicle have been made in good faith, based upon standard criteria, and not solely based upon 'suspicion of evidence of criminal activity.'"). The Officers likewise did not comply with the Department's Procedures of having supervisor authorization of the tow.[13] These failures to follow standard procedure are further indications that the search of the Impala was conducted for an impermissible purpose. This is not to say that the Fourth Amendment requires formulaic obedience to the department regulations. The Impala was in the middle of a traveled roadway. Police officers need to make decisions based on the situation presented and often do not have the time or resources to track down the authorized driver of a rental vehicle. But the failure to follow department procedure points away from the inventory rationale.

As the search of the Impala was conducted based on suspicion of evidence of criminal activity, it does not meet the inventory search exception. The warrantless search of the Impala was, therefore, unreasonable. However, the evidence obtained is nevertheless admissible under the doctrine of inevitable discovery. Alexis was driving with a suspended license and was not authorized to drive the vehicle. No authorized driver was present and the Impala was in the roadway. Therefore, due to the "ordinary investigation into the ownership" of the Impala, the Impala would have been towed and the gun would have been discovered. *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015). Consequently, Defendant's motion is denied.

---

[13] The Procedures provide that "[w]hen the owner or driver cannot provide for the removal of the vehicle, the supervisor *shall direct the arresting officer to contact the county wrecker. The supervisor who authorizes the tow must initial and put their badge number next to the arresting officer's signature on the Vehicle Storage Receipt.*" (Government's Exhibit 6, Miami-Dade Police Policies, Chapter 19-01 at § 6.I.F.2) (emphasis added). Here, the supervisor on the scene—the Sergeant—did not initial the Vehicle Storage Receipt. In addition, the Government did not present any other evidence to demonstrate supervisor authorization.

## B. Expectation of Privacy

Although not necessary for the determination of Defendant's Motion, I find it prudent to explain why Alexis did not have the legitimate expectation of privacy necessary to challenge the search. "[C]apacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). The Eleventh Circuit has described this issue as "standing." *See United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013) ("A defendant has standing to challenge a warrantless search if the defendant had a 'legitimate expectation of privacy' in the property when it was searched.").[14] Although the burden is on the government to prove a search was reasonable under the Fourth Amendment, the defendant has the burden of establishing he had a legitimate expectation of privacy. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). The defendant "must establish both a subjective and an objective expectation of privacy. The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007). In assessing whether society is prepared to recognize a privacy expectation as reasonable, "property ownership is clearly a factor to be considered," but "property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 91 (1980).

A driver generally has an expectation of privacy in a rental vehicle that he or she rents. *See, e.g.*, *Cooper*, 133 F.3d 1394 (finding defendant had an expectation of privacy in a rental

---

[14] The Supreme Court rejected the characterization of the expectation of privacy inquiry as "standing" in *Rakas*. *See Carter*, 525 U.S. at 87 ("The [lower court] analyzed whether respondents had a legitimate expectation of privacy under the rubric of 'standing' doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas* . . . ."). However, many courts continue to characterize this expectation of privacy as "standing."

10

vehicle that was four days overdue). In addition, the driver of a car that he or she owns generally has an expectation of privacy even when driving with a suspended license. *See, e.g.*, *United States v. Walton*, 763 F.3d 655 (7th Cir. 2014) ("Courts do not resolve car search cases in which the driver has a suspended license by omitting the Fourth Amendment analysis and simply concluding the driver lacks standing.") (analyzing *Gant*, 556 U.S. 332); *see also United States v. Majette*, 326 F. App'x 211, 213 (4th Cir. 2009) (vacating conviction based on evidence admitted pursuant to unreasonable search even though the defendant was driving with a suspended license); *United States v. Robertson*, 614 F. App'x 748, 749 (5th Cir. 2015) (affirming suppression of evidence despite defendant driving with a suspended license).[15]

Here, the question is whether a driver of a rental vehicle, who was driving with a suspended license and was not an authorized driver under the rental agreement, had an objectively reasonable expectation of privacy in the vehicle. The Eleventh Circuit recently declined to address this exact issue. *United States v. Gayle*, 608 F. App'x 783, 789 (11th Cir. 2015) ("[W]e have yet to consider whether an unlicensed and unauthorized driver of a rental car has standing to challenge the search of the rented vehicle. . . . [W]e need not decide this standing question here.").

The Eleventh Circuit has, however, assessed a defendant's expectation of privacy in a rental car. *Cooper*, 133 F.3d 1394. In *Cooper*, the Eleventh Circuit reviewed whether a defendant had a legitimate expectation of privacy in a rental car four days after the rental contract expired. *Id.* The Court explained that "[a]lthough fact-specific, case law has established some general boundaries as to what society will accept as reasonable regarding privacy in a motor vehicle." *Id.* at 1398. For example, while a "passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents . . . a driver using a vehicle

---

[15] The Eleventh Circuit has not directly ruled on this issue.

11

with the permission of an absent owner has been found to possess a reasonable expectation of privacy therein." *Id.* The Eleventh Circuit then compared the situation of a driver of an expired rental car to that of a hotel patron over-staying past the checkout time, noting that in the latter case, a patron did not lose his objective expectation of privacy until the room was repossessed by the hotel staff. *Id.* at 1400. The Eleventh Circuit concluded that the defendant, a renter who did not return the rental car on time, had an objectively reasonable expectation of privacy. *Id.*

The Eleventh Circuit has also recently surveyed the current circuit split of whether an unauthorized driver has a legitimate expectation of privacy in a rental vehicle. The majority of the Circuits have adopted one of two bright line tests based on either authorization under the rental agreement (to which I refer as the "Authorization Test") or permission by the authorized driver (to which I refer as the "Permission Test"):

> The Fourth, Fifth, and Tenth Circuits have held that unauthorized drivers of rental vehicles never have standing to challenge a vehicle search. *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990); *United States v. Obregon*, 748 F.2d 1371, 1374-75 (10th Cir. 1984). On the other hand, the Eighth and Ninth Circuits have held that an unauthorized driver may challenge the search of a rental vehicle if he can establish that he had permission from the authorized driver to use the vehicle. *United States v. Thomas*, 447 F.3d 1191, 1198-99 (9th Cir. 2006); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998).

*Gayle*, 608 F. App'x at 788-89.

The rationale for adopting the Authorization Test is best explained by the Fifth Circuit in *United States v. Boruff*, 909 F.2d 111. There, the Fifth Circuit assessed whether a defendant had a legitimate expectation of privacy in a rental car in which he was not an authorized driver. The Fifth Circuit relied on the rental agreement in analyzing the defendant's privacy interest:

> Under the express terms of the rental agreement, [the renter] was the only legal operator of the vehicle. [The renter] had no authority to give control of the car to [the defendant]. The rental agreement also expressly forbade any use of the vehicle for illegal purposes. [Defendant] was well aware of these restrictions when he took possession of the car and used it during the smuggling operation. He therefore had no legitimate expectation of privacy in it.

12

*Boruff*, 909 F.2d at 117. The Fifth Circuit held that, because he knew he was prohibited from driving the rental car, the defendant's expectation of privacy was unreasonable. *Id.*

In addition, while the Third and Sixth Circuits have determined that an unauthorized driver generally does not have standing, they "noted the possibility that exceptional circumstances might create the legitimate expectation of privacy." *Gayle*, 608 F. App'x at 789 (citing *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011); *United States v. Smith*, 263 F.3d 571, 586-87 (6th Cir. 2001)). These exceptional circumstances exist where the driver "was the *de facto* renter of the vehicle." *Smith*, 263 F.3d at 586-87. In *Smith*, the Sixth Circuit upheld the suppression of illegal drugs found in a rented vehicle that the defendant was driving. *Id.* Although the defendant was not the authorized driver of the vehicle, he was married to the woman who had rented the car and he had "personally contacted the rental car company and reserved the vehicle in his name, using his own credit card, which was billed for the rental." *Id.* at 582. The Sixth Circuit noted that the defendant's "business relationship with the rental company and his intimate relationship with his wife, the authorized driver of the vehicle, are relationships which are recognized by law and society." *Id.* at 587. The Sixth Circuit therefore found that "based on these relationships, as well as the fact that he personally paid for the vehicle, [the defendant] had both a subjective and an objective legitimate expectation of privacy." *Id.*

In *United States v. Thomas*, the Ninth Circuit adopted the Permission Test when it reviewed the privacy expectations of an unauthorized driver of a rental vehicle. 447 F.3d 1191. The Ninth Circuit explained that "a defendant may have a legitimate expectation of privacy in another's car if the defendant is in possession of the car, has the permission of the owner, holds a key to the car, and has the right and ability to exclude others, except the owner, from the car." *Id.* The Government argued that the owner of the car—the rental company—had not given the

13

defendant permission to drive the car and thus had "no legal right to control or possess [the] rental car in contravention of the lease agreement." *Id.* at 1198. The Ninth Circuit rejected this argument, comparing the situation in *Thomas* to a "technical violation" of the rental agreement, such as untimely returning the vehicle after the rental period expires. *Id.*[16]

In this case, I find that Alexis was not authorized by Hertz to drive the Impala.[17] Moreover, I find he was driving with a suspended license. I also find that Andrews, the renter and authorized driver of the Impala, gave Alexis permission to drive the Impala. Andrews gave Alexis permission to not only regularly borrow the Impala, but also to tint the vehicle's windows in violation of Florida law supposedly at Andrews's expense. After reviewing the case law, I question the reasoning of the Eighth and Ninth Circuits' Permission Test. I find the Ninth Circuit's rationale in adopting the Permission Test unconvincing for reasons the Third Circuit explained in *Kennedy*. *Kennedy*, 638 F.3d at 166. The Third Circuit correctly identifies the flaw in comparing an unauthorized driver of a rental car to a renter who retains a rental car after the rental period expires. The risk to the owner of the rental is significantly different in the two contexts. An owner may "require [authorized drivers] to provide information . . . such as their

---

[16] *See also United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (remanding case to determine whether the defendant had permission by the authorized driver).

[17] While neither Party introduced the rental agreement into evidence, based on the testimony, I find that Alexis was not given authorization to drive the vehicle. Moreover, a brief online survey of rental policies indicates that unauthorized drivers are generally prohibited from driving the rental vehicle. *See, e.g.*, *General Policies and Fee Information*, Dollar Rent A Car (March 9, 2016), https://www.dollar.com/AboutUs/GeneralPolicies.aspx ("The DOLLAR vehicle may be driven only by an authorized driver. An authorized driver is the renter and any additional person who appears at the time of rental and signs the rental agreement. All authorized drivers must . . . have a valid driver's license, provide a physical street resident address, a major credit card in their own name, and fulfill our other qualifications, which vary by location. . . . No other persons are authorized to drive the vehicle."); *Rental Qualifications and Requirements*, The Hertz Corporation (March 9, 2016), https://www.hertz.com /rentacar/reservation/reviewmodify cancel/templates/rentalTerms.jsp?KEYWORD=OPERATORS&EOAG=MSPT11 ("Individuals not automatically covered on the Rental Agreement as Authorized Operators . . . may be signed on as an 'Additional Authorized Operator' (AAO). AAO's must be present and may be signed on to the rental agreement").

ages, whether they have valid driver's licenses, and access to their driving records." *Id.* at 167. An unauthorized driver is never asked to provide this information. *Id.* The owner therefore did not agree to rent the car to an individual who did not provide this valuable information relevant to determine the driver's risk to the owner. *Id.* In contrast, when a renter overstays the lease of a rental, there are oftentimes built in billing mechanisms, such as tardiness and penalty fees, to easily compensate the owner. *Id.* The Third Circuit concluded that "society views authorized drivers who return rental cars a few hours late quite differently from unauthorized drivers who borrow rental cars without the rental company's knowledge or permission. . . . . [T]he lack of a cognizable property interest in the rental vehicle and the accompanying right to exclude makes it generally unreasonable for an unauthorized driver to expect privacy in the vehicle." *Id.* at 167-68.

This reasoning is a natural extension of the analysis found in *Cooper*, where the Eleventh Circuit held that a defendant had a legitimate expectation of privacy in a rental car four days after the rental contract expired. 133 F.3d 1394. In analyzing the reasonableness of the expectation of privacy, the Eleventh Circuit distinguished *Wellons*, a case in which the Fourth Circuit found a driver had no legitimate expectation of privacy because he was unauthorized under the rental agreement. *Id.* at 1400 (citing *Wellons*, 32 F.3d 117). The Eleventh Circuit explained that, unlike in *Wellons*, the defendant in *Cooper* was still "in privity of contract" with the owner, the rental company. *Id.* Based on this difference, the Eleventh Circuit concluded that the defendant—a renter under an expired rental agreement—had an expectation of privacy that "was materially different from that of" the defendant in the *Wellons*—an unauthorized driver. *Id.*

The Eleventh Circuit also reasoned that a contrary result would mean "a driver could not expect privacy in a rental car even one minute after the rental contract expired." *Id.* at 1401. The Eleventh Circuit explained that finding that the defendant had a reasonable expectation of

15

privacy was consistent with the idea that "a simple phone call could have extended the rental contract past the date of the warrantless search." *Id.* at 1402.

These same distinctions are relevant in assessing the reasonableness of Alexis's expectation of privacy in this case. Here, unlike the defendant in *Cooper*, Alexis had no relationship—contractual or otherwise—with Hertz. He never provided any information to Hertz or sought authorization. Unlike the defendant in *Smith*, Alexis produced no evidence that he contacted Hertz, reserved the Impala under his name, or used his credit card to pay for the vehicle. Moreover, Alexis likely believed that Hertz would not have permitted him to drive the Impala, due to his suspended license. This is evidenced by the fact that Alexis appears to have used Andrews as a "straw man" to rent the Impala under a different name.[18] Andrews did not overstay her rental agreement, a situation whereby Hertz could have easily sent Andrews a bill for the additional time. Rather, she let a driver regularly use the Impala using a suspended license and even put illegal tints on the vehicle. As such, Alexis could not have simply called Hertz to get permission to drive the Impala.

That Alexis knowingly drove a rental vehicle without Hertz's authorization and with a suspended license, suggests this situation is closer to that of the driver of a stolen vehicle[19] as opposed to that of a renter under an expired contract. Likewise, Alexis illegally tinted the windows of the Impala and manipulated the panel to disguise contraband, further indicating

---

[18] This conclusion is based on the testimony that Andrews regularly permitted Alexis to use the Impala, the only items found in the Impala appear to belong to Alexis, and Andrews permitted Alexis to illegally tint the Impala. I also did not find credible Andrews's testimony that she tinted the windows to protect her grandchildren from the sun. My strong suspicion was that monies for payment of the rental car and the tint came from Alexis rather than Andrews. I, therefore, find it likely that while Andrews was the name on the rental agreement, the primary driver was Alexis.

[19] "[I]t is hardly surprising that several other courts have held that the possessor of a stolen vehicle lacks standing to challenge a search of the vehicle." *United States v. White*, 504 F. App'x 168, 172 (3d Cir. 2012) (surveying the lack of privacy expectation in stolen vehicles in the Second, Fifth, and Sixth Circuits).

16

Alexis's intention to appropriate the Impala for his own purposes without regard for the owner's wishes. I, therefore, find that Alexis did not have an objective expectation of privacy that society is prepared to recognize as reasonable, and he may not challenge the search. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant Maurice Alexis's Motion to Suppress (DE 13) is **DENIED**.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this 11 day of March, 2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE